# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KEDAR CORPORATION F/K/A          :
S&G ELECTRIC, INC.,              :
                                 :     CIVIL ACTION
                    Plaintiff,   :
                                 :
        v.                       :
                                 :     NO.  11-6446
AMERICAN CONTRACTORS             :
INDEMNITY COMPANY and            :
IES, LTD d/b/a PRIME ENERGY      :
SERVICES,                        :
                                 :
                    Defendants.  :

## MEMORANDUM

BUCKWALTER, S. J.                                    February 7, 2012

Currently pending before the Court is a Motion by Defendant American Contractors

Indemnity Company ("ACIC") for Summary Judgment on Count IV of Plaintiff Kedar

Corporation f/k/a S&G Electric, Inc.'s ("S&G")[1] Complaint.  For the reasons which follow, the

Motion is granted and Plaintiff is given twenty days to amend the Complaint to properly assert a

claim under the Performance Bond.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On May 21, 2007, Plaintiff S&G entered into a subcontract (the "Subcontract") with

Defendant IES, Ltd. d/b/a Prime Energy Services ("Prime Energy"), wherein Prime Energy

---

[1]  Although the parties refer to Plaintiff as "Kedar Corporation," which is its current
name, the major events at issue took place while Plaintiff was operating under the name "S&G
Electric, Inc.," and the Performance and Payment Bonds were both written in favor of S&G as
obligee.  To avoid confusion, the Court refers to Plaintiff as S&G.

agreed to furnish all labor, material, agreed-upon equipment, services, and supplies in connection with the installation of lighting fixtures and sensors in certain buildings at Edinboro University of Pennsylvania in Edinboro, Pennsylvania (the "Project").  (Def. ACIC's Mot. Summ. J., Decl. of John C. Yi ("Yi Decl.") ¶ 7, Oct. 26, 2011.)  The general contractor on the Project was Honeywell Building Solutions, SES ("Honeywell"), S&G was its subcontractor, and Prime Energy was, in turn, S&G's subcontractor.  The total price for Prime Energy's Subcontract was $368,440.99.  (Id. ¶ 8.)

Thereafter, on June 12, 2007, ACIC, as surety, and Prime Energy, as principal, issued their joint and several Performance and Payment Bonds, both of which were applicable to the Subcontract.  (Id. ¶ 9, Exs. A & B.)  Each Bond was written in the penal sum of $368,440.99 and was in favor of S&G as obligee.  (Id. ¶ 10, Exs. A & B.)  The Performance Bond stated that Prime Energy would:

> fully indemnify and save harmless [S&G] from all loss, liability, costs, damages, penalty, attorneys' fees or expense which [S&G] may incur by reason of failure to well and truly keep and perform each, every and all of the terms of said agreement on the part of [Prime Energy] to be kept and performed, including but not limited to, to completion within the time specified of all work covered by said agreement, performance of all obligations, and guarantees of the Obligee relating to such work under the contract with the Owner.

(Id. ¶ 11, Ex. A.)  In addition, it provided that "[a]ny proceeding, legal or equitable, under this bond may be instituted . . . within six months after the [Prime Energy] Default or within six months after [Prime Energy] ceased working or within six months after [ACIC] refuses or fails to perform its obligations under his Bond, whichever occurs first."  (Id. ¶ 12, Ex. A.)  Similarly, the Payment Bond required that Prime Energy "promptly make payment to all claimants . . . for all labor and materials used or reasonably required for use in the performance of the subcontract."

(Id. ¶ 13, Ex. B.)  A "claimant" was defined as "one having a direct contract with the Principal for labor, material, or both, used or reasonably required for use in the performance of the contract[.]"  (Id. ¶ 14, Ex. B.)  The Payment Bond went on to state that "[n]o suit or action shall be commenced hereunder by any claimant . . . [a]fter the expiration of one (1) year following the date on which Principal ceased work on said subcontract[.]"  (Id. ¶ 15, Ex. B.)

On April 21, 2009, Narasimha Shenoy, President of S&G, wrote to John Romano and Robert Aiello of Prime Energy.  He indicated that Dan Mori of Honeywell had called him that morning, stated that Prime Energy had not been responsive to requests to complete the job, and remarked that Honeywell was giving S&G the opportunity to complete the work quickly.  (Pl.'s Resp. Opp'n Mot. Summ. J., Decl. of Narashima Shenoy ("Shenoy Decl."), ¶ 17, Ex. H, Dec. 8, 2011.)  In light of these issues, on April 29, 2009, Mr. Shenoy met with Messrs. Aiello and Romano to discuss the ongoing work.  (Id. ¶ 8.)  The following day Mr. Mori e-mailed Mr. Shenoy demanding a completion schedule by the next day.  (Id. ¶ 18, Ex. I.)  He stated that "[w]e need to have people finishing the remaining items on campus starting next week or we will make other arrangements with another company.  Our patience on the lighting matter is gone and we are taking a significant credibility hit from the customer due to Prime's missteps on this project."  (Id.)  Mr. Shenoy promptly wrote back stating that he met with Prime Energy the previous day and that they were putting together a schedule to complete the work, which he intended to provide the next day.  (Id. ¶ 19, Ex. J.)  Mr. Mori replied noting that he wanted all the lighting matters addressed by the end of May 31, 2009, with no exceptions.  (Id.)

Thereafter, Prime Energy's failures on the Project continued.  (Id. ¶ 9.)  Via letters dated August 14, 2009, S&G notified both ACIC and Prime Energy that "by reason of delays in

performance and after repeated demands and failure to perform portions of its work under the [Subcontract], . . . S&G is considering declaring a Principal Default and is hereby requesting and attempting to arrange a conference with the Principal and Surety within fifteen days after receipt of this notice to discuss methods of performing the Construction Contract."  (Yi Decl. ¶ 16, Ex. C; Shenoy Decl., Exs. A & B.)  Defendant ACIC claims that, subsequent to this letter, representatives of S&G, ACIC, and Prime Energy again jointly discussed completion of the Project to avoid a Principal Default.  (Yi Decl. ¶ 17.)  Plaintiff, however, asserts that despite the August letters, it received no response from either Prime Energy or ACIC.  (Shenoy Decl. ¶ 10.)

No resolution having been reached, S&G sent a letter, dated September 23, 2009, to Prime Energy terminating Prime Energy's Subcontract due to its "continued failure to perform and complete [its] work, despite numerous promises . . . to do so."  (Id. ¶¶ 18-19, Ex. D.)  On the same date, S&G wrote to ACIC, stating as follows:

> As you know, I wrote to you on August 14, in reference to your Principal's default on the above Project.  Despite meetings, phone calls and email exchanges, your Principal has failed to perform.  Accordingly, Prime's Contract with us has been terminated.  A copy of the termination notice is enclosed.
>
> Demand is hereby made upon you to honor your obligations under the Performance Bond No. 1000772502 and complete or pay for completion of the work.  Please contact me immediately.
>
> In the interim, in order to mitigate damages and in response by both Honeywell and Edinboro University, we are manning the Project and will continue to perform until we have either reached an agreement with you for completion of the work or until the work has been completed.

(Id. ¶ 20, Ex. E.)  As of September 23, 2009, Prime Energy performed no further work on its Subcontract.  (Id. ¶ 21.)

Thereafter, Mr. Shenoy corresponded via e-mail with Albert Sramek of Forcon

4

International ("Forcon"), who was ACIC's forensic consultant on the Project, in order to set up a meeting to discuss the status of the ongoing work being performed by S&G.  (Shenoy Decl. ¶ 13, Ex. E.)  Mr. Sramek e-mailed back on October 13, 2009, scheduling a meeting and requesting certain written information regarding the ongoing work at the Project.  (Id. ¶ 14, Ex. F.)  Mr. Shenoy provided a copy of the Project expense summary.[2]  (Id. ¶ 15, Ex. G.)  Subsequently, on October 15, 2009, Mr. Shenoy met with representatives of Forcon, at which time they reviewed the situation, and S&G submitted the current cost incurred in completing the work.  (Id. ¶ 16.)  Mr. Shenoy explicitly told them that S&G would continue working until the Project was completed, and at no time did the Forcon representatives direct S&G to stop working on the Project.  (Id.)  The meeting attendees agreed that Prime Energy and S&G would work together to complete the Project with ACIC.  (Id.)  On November 2, 2009, David Davis, counsel for S&G, wrote to Carl Schnabel of Forcon acknowledging Forcon's recent request for certain information and asking that Mr. Schnabel contact him so that the information could be provided.  (Id. ¶ 20, Ex. K.)

Subsequently, the record suggests an extended lull in communications between the parties.  As of March 2010, S&G substantially completed work on the Project, with full completion of all contract and punch list work on or about May 11, 2010.  (Id. ¶ 21.)  David Makara, also counsel for S&G, then wrote to ACIC and Mr. Schnabel on October 6, 2010, making a demand for payment on the Performance Bond in the amount of $197,091.22.  (Id. ¶

---

[2]  Mr. Shenoy's Declaration indicates that he provided this summary after Mr. Sramek's October 13, 2009 e-mail, but then states he gave it to him on October 11, 2009.  (Id. ¶¶ 14-15.)  Although Plaintiff's Response Brief contains a copy of the expense summary given to Mr. Sramek, the date of delivery is not apparent from that exhibit.

23, Ex. L.)  ACIC requested some further information and, via correspondence of February 23,

2011, Mr. Makara provided Mr. Schnabel with a disk containing various documentation in

support of S&G's claim on the Bond.  (Id. ¶ 24, Ex. M.)  On April 5, 2011, Mr. Makara followed

up with Mr. Schnabel as to ACIC's response to S&G's demand for payment.  (Id. ¶ 25, Ex. N.)

Thereafter, on April 14, 2011, Mr. Makara contacted John Yi of ACIC affiliate HCC Surety

Group confirming that ACIC was reviewing the produced documents.  (Id. ¶ 26, Ex. O.)  The

letter went on to state that, "as you assess the claim, I write to inquire whether you would agree

to execute the enclosed Tolling Agreement, tolling the statue [sic] of limitations so that we need

not initiate litigation at this point to protect our clients' rights while our discussions are

ongoing."  (Id.)  On April 29, 2011, S&G and ACIC then executed the Tolling Agreement, which

reserved ACIC's "right to claim that any applicable statute of limitations or the limitation of

actions period set forth in the Bond has expired prior to the effective date of the Tolling

Agreement."  (Id. ¶ 27, Ex. P.)

     Discussions continued and, on April 26, 2011, Robert T. Carlton, Jr., counsel for ACIC,

wrote to Mr. Makara indicating that ACIC had reviewed the materials submitted on February 23,

2011 in support of S&G's claim and had several questions regarding the scope of Prime Energy's

work, Prime Energy's applications for payment, unfinished work, etc.  (Id. ¶ 28, Ex. Q.)  The

letter included "a complete reservation of all of ACIC's rights, remedies and defenses as surety

for Prime Energy."  (Id.)  By letter of June 20, 2011, counsel for S&G provided the requested

additional information.  (Id. ¶ 29, Ex. R.)  Ultimately, on July 18, 2011, ACIC denied S&G's

claim on multiple grounds, including a determination that S&G's claim was time-barred because

more than six months had elapsed from Prime Energy's default in either April or September

2009.  (Id.)

On September 26, 2011, Plaintiff commenced this action against Defendants, alleging the following claims: (1) breach of contract against Defendant Prime Energy; (2) violation of the Pennsylvania Contractor and Subcontractor Payment Act, 73 P.S. § 501, et seq. against Defendant Prime Energy; (3) unjust enrichment against Defendant Prime Energy; and (4) breach of Payment Bond against Defendant ACIC.  (Compl. ¶¶ 21-47.)

## II.    STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg

Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec., 475 U.S. at 586.  "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  Anderson, 477 U.S. at 249-50.

## III.   DISCUSSION

Defendant ACIC's current Motion for Summary Judgment as to Count IV of the Complaint is two-fold.  First, Defendant alleges that the Plaintiff is not a "claimant" on the Payment Bond and thus cannot make a claim against ACIC as Payment Bond surety.  Second,

Defendant asserts that this civil action was not commenced within the time limits specified in either the Performance Bond or the Payment Bond.  The Court considers each argument separately.

**A.      Whether Plaintiff is a "Claimant" on the Payment Bond**

Count IV of Plaintiff's Complaint seeks payment on the Payment Bond from ACIC in the amount of $197,091.22 for labor and materials Plaintiff provided on the Project to complete Prime Energy's scope of work.  (Compl. ¶¶ 39-40.)  Because, under the Payment Bond, ACIC agreed to be jointly and severally liable for the claims of all proper claimants who furnished, but were not paid for, labor and/or materials on the Project, Plaintiff asserts entitlement to payment from ACIC.  (Id. ¶ 38.)  Challenging this cause of action, Defendant ACIC now alleges that Plaintiff is not a "claimant" as defined by this instrument.

As a basic principle, "[a] performance bond assures the obligee—in this case the general contractor—that if the principal fails to perform, the surety will discharge the principal's obligations either through performance or by paying the obligee the excess cost of performance." Fid. & Deposit Co. of Md. v. Westra Constr., Inc., No. Civ.A.08-1219, 2010 WL 1904524, at *1 n.2 (M.D. Pa. May 10, 2010).  Payment bonds, on the other hand, "ensure that laborers, subcontractors, and suppliers are paid; thus, such bonds are issued for a specified financial sum." Id.; see also United States v. Daddona, 34 F.3d 163, 165 n.1 (3d Cir. 1994) ("A payment bond, sometimes referred to as a labor and materials bond, guarantees that the general contractor's subcontractors and materialmen will be paid for their services."); 17 Am. Jur. 2d Contractors Bonds § 1 (2011).

"To recover under a payment bond, normally a supplier must prove (1) that it sold

9

materials to the principal; (2) that the materials it sold were used in the prosecution of the project covered by the bonds; and (3) that the supplier was not paid all sums rightfully due for materials supplied for the covered project." Pennex Aluminum Co., a Div of Metal Exch. Corp. v. Int'l Fid. Ins. Co., 818 F. Supp. 772, 776 (M.D. Pa. 1993). "[T]he owner-obligee may generally not recover damages from the surety under the payment bond, as the bond is intended to provide payment to persons supplying labor and material to the contractor, not to provide a financial recovery to the owner-obligee." Travelers Cas. & Sur. Co. v. Dormitory Auth. – State of N.Y., 735 F. Supp. 2d 42, 87 (S.D.N.Y. 2010). As such, "[n]umerous courts have denied recovery to an owner-obligee under a payment bond, or at least observed that 'the caselaw generally disfavors' such a suit." Id. (citing Fed. Ins. Co. v. Me. Yankee Atomic Power Co., 183 F. Supp. 2d 76, 81 (D. Me. 2001) (collecting cases)). This holds true "even where an owner-obligee itself purchases labor and materials in order to complete a contract after a contractor's default."[3] Id. (citing 11 Couch on Insurance § 165:15); see also Am. Mfrs. Mut. Ins. Co. v. Sherborn Meadows, LLC, No. Civ.A.07-11711, 2008 WL 5396479, at *3-4 (D. Mass. Dec. 22, 2008) (finding that a payment bond, "although designed to benefit the owner, restricts surety payments directly to 'claimants'" and that claimants are laborers and materialmen who furnish labors or materials used by the principal in the contract); Ayers Enters., Ltd. v. Exterior Designing, Inc., 829 F. Supp. 1330, 1333 (N.D. Ga. 1993) (holding that "payment bonds are intended to protect laborers and materialmen rather than the obligee of the bond"); Ribeira & Lourenco Concrete

---

[3] Notably, an exception exists where the obligee seeks indemnification from the surety for payments it made to the principal's subcontractors after the surety refused to the pay them and after some of those subcontractors asserted mechanics' liens against the owner's property. Id. These facts are not present in this case.

Constr. v. Jackson Health Care Assoc., 603 A.2d 976, 980 (N.J. App. Div. 1992) (holding that

"[g]enerally, an obligee under a labor an material payment bond is not entitled to payments for

labor and material paid by the obligee who completes the contract after the contractor's default")

(citing Couch, Cyclopedia of Ins. Law 2d § 47:232, 373 (1982)).

In the present matter, the Payment Bond provided that the surety's obligation arose only

where the Principal—i.e., Prime Energy—failed to promptly make payment to all claimants "for

all labor and material used or reasonably required for use in the performance of the subcontract."

(Yi Decl., Ex. B.)  The Payment Bond went on to define a "claimant" as:

> [O]ne having a direct contract with the Principal for labor, material, or both, used or
> reasonably required for use in the performance of the contract, labor and material
> being construed that part of water, gas, power, light, heat, oil, gasoline, telephone
> service or rental of equipment directly applicable to the subcontract.

(Id.)  In other words, the Payment Bond guaranteed payment to all of Prime Energy's

subcontractors and materialmen with whom it had a direct contract.  Plaintiff, as principal, did

not have such a "direct contract" with the Prime Energy for labor or material.  Rather, Prime

Energy was Plaintiff's subcontractor in the scope of the Project.  Once Prime Energy defaulted,

Plaintiff's remedy to recover costs related to the completion of the work fell within the realm of

the Performance Bond, not the Payment Bond.[4]  See Mountbatten Sur. Co., Inc. v. Brunswick

Ins. Agency, No. Civ.A.00-1255, 2001 WL 34371699, at *10 (E.D. Pa. Nov. 13, 2001) ("Where

a surety provides performance bonds to a subcontractor, the performance bonds secure the

subcontractor's obligation to perform the work in accordance with its subcontracts.  In the event

that the subcontractor defaults, the bonds obligate the surety to complete the subcontracts or to

---

[4] Defendant ACIC admits that "S&G could have asserted this claim as Obligee on the
Performance Bond."  (Def. ACIC's Mem. Supp. Mot. Summ. J. 6.)

pay the general contractor damages for its increased cost of performance up to the limit of the bonds."). As Plaintiff was clearly not a "claimant" within the meaning of the Payment Bond—a fact which Plaintiff does not dispute—it may not pursue a claim against ACIC for payment under that Bond.

**B.**     **Whether Plaintiff's Claim Under the Performance Bond Is Barred by the Express Terms of the Performance Bond and the Statute of Limitations**

Defendant ACIC additionally argues that to the extent Plaintiff asserts a claim under the Performance Bond, the claim is time-barred. Specifically, it contends that the Performance Bond required initiation of legal action within six months after the earliest of either the principal's default or ACIC's refusal to pay under the Bond, yet the litigation was not commenced until a year and a half after default.

As an primary matter, the Court must note that Plaintiff never brought a claim under the Performance Bond. Rather, the sole cause of action against ACIC in the Complaint is limited to the Payment Bond—a document under which, as explained above, Plaintiff has no viable cause of action. Nonetheless, Plaintiff's Brief in Opposition to the Motion for Summary Judgment proceeds on the notion that it brought such a claim, and Defendant's Reply Brief presumes that Plaintiff informally seeks leave to amend to assert a Performance Bond claim. While Federal Rule of Civil Procedure 15(a) generally requires that leave to amend a complaint be freely given when justice so requires, a district court may deny leave to amend a complaint where "it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." Lake v. Arnold, 232 F.3d 360, 373 (3d Cir. 2000) (citing Foman v. Davis, 371 U.S.

178, 182 (1962)).  Because Defendant ACIC asserts that an amendment to add a claim under the

Performance Bond would be futile in light of the time bar on that claim, the Court must now

consider the parties' substantive arguments in that context.[5]

As set forth above, the Performance Bond provided that "[a]ny proceeding, legal or

equitable, under this bond may be instituted . . . within six months after the [Prime Energy]

Default or within six months after [Prime Energy] ceased working or within six months after

[ACIC] refuses or fails to perform its obligations under his Bond, whichever occurs first."  (Id. ¶

12, Ex. A.)  Based on the present record, Plaintiff had six months after Prime Energy's default on

September 23, 2009—i.e., until March 23, 2010—to initiate litigation.  Plaintiff, however, did

not file its Complaint until September 26, 2011—more than a year and a half later.

As a general rule, the statute of limitations for an action on a performance bond or

payment bond is one year.  42 Pa. Cons. Stat § 5523 (3).  Nonetheless, under Pennsylvania law,

parties to a contract may agree to a shortened contractual limitations period.  42 Pa. Cons. Stat §

5501(a) ("An action, proceeding or appeal must be commenced within the time specified in or

---

[5] As a general rule, "'[f]utility' means that the complaint, as amended, would fail to state
a claim upon which relief could be granted."  Holst v. Oxman, 290 Fed. App'x 508, 510 (3d Cir.
2008); In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).  The
futility analysis on a motion to amend is essentially the same as a Rule 12(b)(6) motion.  Holst,
290 Fed App'x at 510.  The trial court may thus deny leave to amend where the amendment
would not withstand a motion to dismiss.  Massarsky v. Gen. Motors Corp., 706 F.2d 111, 125
(3d Cir. 1983).

The procedural posture of this case, however, is somewhat unique in that Plaintiff has not
brought a motion for leave to amend the Complaint, but rather seeks to assert a new claim in the
course of defending against ACIC's Motion for Summary Judgment.  ACIC, for its part,
contends that the claim under the Performance Bond is futile and would not survive its summary
judgment motion.  In light of this unusual framework, the Court considers whether a claim for
breach of contract under the Performance Bond could pass muster under the summary judgment
standard and under the present evidentiary record.

pursuant to this chapter, unless, in the case of a civil action or proceeding, a different time is provided by the title or another statute or a shorter time which is not manifestly unreasonable is prescribed by written agreement.").  A contractual modification of a statute of limitations is valid if not manifestly unreasonable.  Caln Village Assoc. LP v. Home Indem. Co., 75 F. Supp. 2d 404, 409 (E.D. Pa. 1999).  Courts applying Pennsylvania law have found a contractual six-month limitations period to not be manifestly unreasonable.  PSC Info. Grp. v. Lason, Inc., 681 F. Supp. 2d 577, 587 (E.D. Pa. 2010) (citing Holtby v. Zane, 180 A. 674 (Pa. 1908) and Brady v. Prudential Ins. Co., 32 A. 102 (Pa. 1895)).

In the present case, Plaintiff does not contend—nor has the Court found any cases holding —that the six month limitations period, in the context of this Performance Bond,[6] is manifestly unreasonable.[7]  Instead, Plaintiff rests its opposition on the theory that, under the Pennsylvania doctrine of fraudulent concealment, Defendant ACIC's misleading actions and misrepresentations in the course of its ongoing negotiations with Plaintiff effected a waiver of the contractual limitations period and created an estoppel on Defendant's enforcement of the time-bar.

Pennsylvania courts have developed the doctrine of fraudulent concealment based on a theory of estoppel.  Fine v. Checcio, 870 A.2d 850, 860 (Pa. 2005).  This doctrine "tolls the statute of limitations where 'through fraud or concealment the defendant causes the plaintiff to

---

[6] Multiple courts have found that a six-month contractual statute of limitations that interferes with a federal statutory right is unreasonable.  See Grosso v. Fed. Exp. Corp., 467 F. Supp. 2d 449, 456 (E.D. Pa. 2006) (collecting cases).  No such federal statutory right, however, is at issue in the present case.

[7] Indeed, as noted by Defendant, even if the Court were to invalidate the contractual time period and apply the statutory one-year period, this lawsuit would still technically be untimely.

relax his vigilance or deviate from the right of inquiry.'" Bohus v. Beloff, 950 F.2d 919, 925 (3d Cir. 1991) (quoting Ciccarelli v. Carey Can. Mines, Ltd., 757 F.2d 548, 556 (3d Cir. 1985)). Although no showing of intentional deception is required, "[t]here must be an affirmative and independent act of concealment that would divert or mislead the plaintiff from discovering the injury." Id.; see also Fine, 870 A.2d at 860. "Mere silence in the absence of a duty to speak cannot suffice to prove fraudulent concealment." Krapf v. St. Luke's Hosp., 4 A.3d 642, 649-50 (Pa. Super. Ct. 2010), appeal denied __ A.3d ___, 2011 WL 5966318 (Pa. Nov. 30, 2011); see also Mest v. Cabot Corp., 449 F.3d 502, 517 (3d Cir. 2006) ("Silence can constitute fraud only when there is an affirmative duty to disclose because of a fiduciary relationship between the parties or a similar relationship of trust and confidence."). The plaintiff bears the burden of proving fraudulent concealment by clear, precise, and convincing evidence, and the issue of whether estoppel results from the established facts is a question of law. Fine, 870 A.2d at 860. A statute of limitations that is tolled under this doctrine beings to run "when the injured party knows or reasonably should know of his injury and its cause." Id. at 861. In other words, the party asserting the claim must "use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period." Baselice v. Franciscan Friars Assumption BVM Province, Inc., 879 A.2d 270, 275 (Pa. Super. Ct. 2005); Meehan v. Archdiocese of Phila., 870 A.2d 912, 919 (Pa. Super. Ct. 2005).

In the context of contractual dealings, the Pennsylvania Supreme Court has recognized that "any act which tends to mislead the plaintiff, while parties are dealing on friendly terms, to avoid litigation, will be held to be evidence of a waiver of [a contractual limitations period]."

Fratto v. New Amsterdam Cas. Co., 252 A.2d 606, 608 (Pa. 1969) (quoting Hocking v. Howard Ins. Co., 18 A. 614 (Pa. 1889)).  "A contractual time limitation as to when suit must be brought may be extended or waived where the actions of the [defendant] lead the [plaintiff] to believe that the limitation period will not be relied upon."  14A Summ. Pa. Jur. 2d Insurance § 18:3.  This estoppel/waiver defense has found substantial application in the related realm of insurance contracts, which often contain contractual time limitations on the institution of litigation.  In such cases, courts have found that "[t]he insured must establish a factual basis to assert the defense of waiver or estoppel."  Prime Medica Assoc. v. Valley Forge Ins. Co., 970 A.2d 1149, 1157 (Pa. Super. Ct. 2009) (collecting cases), appeal denied, 989 A.2d 918 (Pa. 2010).  "The insured must present evidence establishing reasonable grounds for believing that the time limit would be extended or that the insurer would not strictly enforce the suit limitation provision."  Id. (internal quotations omitted).  "'If the insurer, . . . by any act throws the insured off his guard as to the necessity of performing some duty enjoined by the policy, the insurer should not be permitted to take advantage of the failure to act.'"  Commonwealth v. Transam. Ins. Co., 341 A.2d 74, 76 (Pa. 1975) (quoting Fedas v. Ins. Co. of Pa., 151 A.2d 285, 286-87 (Pa. 1930)).  In other words, "[i]f in the course of the negotiations the company gave the plaintiff reasonable grounds for believing that the time limit would be extended or that such provision would not be strictly enforced, it could not subsequently insist on its strict enforcement without giving him a reasonable time thereafter to bring his action."  McMeekin v. Prudential Life Ins. Co. of Am., 36 A.2d 430, 432 (Pa. 1944).

       In the present case, Plaintiff argues that a course of dealing existed between S&G and ACIC, whereby S&G was led to believe that the Performance Bond's limitations period would

not be enforced by ACIC.  (Pl.'s Resp. Opp'n Mot. Summ. J. 9.)  At all relevant times, ACIC

was advised that its principal, Prime Energy, had defaulted and that S&G was performing the

work that Prime Energy was obligated to perform and for which ACIC was responsible under the

Performance Bond.  (Id. at 10.)  Nonetheless, ACIC assented to S&G's completion of the work

and was kept apprised of the progress of the work.  (Id.)  When work on the Project was finally

completed in May of 2010, ACIC and Plaintiff engaged in continued negotiations regarding the

cost incurred by S&G to complete Prime Energy's scope of work.  (Id.)  At no point did ACIC

take the position that Plaintiff's claims were barred by the statute of limitations of the

Performance Bond.  (Id.)  When ACIC ultimately denied S&G's claim on July 18, 2011, Plaintiff

promptly instituted litigation on September 26, 2011.  (Id.)  Accordingly, Plaintiff now asserts

that this case presents, at a minimum, an issue of fact as to whether ACIC waived the contractual

limitations period.

Defendant, however, responds, that ACIC was not obligated to take over and complete

the subcontract, but only to indemnify Plaintiff from all loss, liability, costs, and damages which

Plaintiff could incur by reason of Prime Energy's failure to perform.  (Def. ACIC's Reply Br. 2.)

To the extent that Plaintiff now seeks an estoppel, Defendant asserts that it has failed to prove

that estoppel by evidence that is "clear, precise and convincing."  (Id. at 3.)  Specifically,

Defendant notes that there is no evidence of any communication between S&G and ACIC during

the period from November 2, 2009 to October 6, 2010, let alone any affirmative independent act

of concealment upon which Plaintiff relied.  (Id. at 4.)  As of March 23, 2010, the six month

limitations period had long expired so that any communications after that date are irrelevant.

(Id.)  Finally, to the extent Plaintiff relies on the Tolling Agreement, Defendant claims that the

Agreement specifically indicated that ACIC reserved "the right to claim that any applicable statute of limitation or the limitation of actions period set forth in the Bond had expired prior to the effective date of the Tolling Agreement." (Shenoy Aff., Ex. P.)

Taking the record in the light most favorable to Plaintiff, however, the Court finds that a genuine issue of material fact exists as to whether Defendant ACIC should be estopped from asserting a time bar pursuant to the limitations period contained in the Performance Bond. Plaintiff clearly notified ACIC of Prime Energy's default on September 23, 2009. (Shenoy Decl. ¶ 20, Ex. E.) At the same time, Plaintiff made an unequivocal demand for ACIC to honor its obligations under the Performance Bond. (Id.) Thereafter, during the months of October and November 2009, representatives for both S&G and ACIC corresponded regularly regarding the ongoing work being performed by S&G in completion of Prime Energy's subcontract. (Id. ¶¶ 13-20 & Exs. E-K.) The last documented correspondence between the parties from this time period was on November 2, 2009, wherein counsel for S&G contacted ACIC's representative and wrote, in pertinent part, as follows:

> I understand that both you and your associate have been brought into this matter on behalf of the Surety arising out of the performance bond claim of Kedar for the failure of the Principal to complete its work on the Project. I understand also that you have asked for certain information to be provided. I believe that I have much of what it is that you want, however, I would like to speak with you in advance before sending you anything just to make certain that I am sending you everything you want.

> I called and left a message on your voicemail last week, but as of this letter, I have not yet heard back from you.

> *Please get in touch with me at your earliest convenience so that we can move this matter forward.*

(Id. Ex. K (emphasis added).)

As of May 2010, S&G finally completed work on the Project, yet the next documented communication between the parties did not come until October 6, 2010.  Notwithstanding the interim close of the limitations period on March 23, 2010 and the lengthy lapse in communications, the parties resumed their discussions regarding Plaintiff's demand for payment on the Performance Bond, with no indication by ACIC that it intended to enforce the time bar.  In October 2010, Plaintiff made another demand for payment on the Performance Bond, this time giving a dollar figure of $197,091.22.  (Id., Ex. L.)  Although the record shows another lull in written correspondence, the next letter, dated February 23, 2011, intimates that some communications occurred in the interim, as follows: "*As you requested*, I enclose a disk containing the following documentation in support of my client's claim on the bond in this matter . . . [list of documents] . . . I believe this is all of the documentation you had requested regarding Kedar/S&G Electric, Inc.'s claim.  The summaries and documentation support the numbers broken out in the Edinboro University's Project Summary dated March 9, 2010."  (Id., Ex. M (emphasis added).)  On April 5, 2011, S&G's counsel again wrote to inquire into ACIC's response to Plaintiff's demand.  (Id., Ex. N.)  The next letter of record, dated April 14, 2011, suggests that the parties had exchanged some e-mail correspondence.  (Id., Ex. O.)  In that letter, S&G's counsel confirmed ACIC's representation that it was taking some time to go through the documentation provided by S&G.  The letter also remarked as follows: "[A]s you assess the claim, I write to inquire whether you would agree to execute the enclosed Tolling Agreement, tolling the statute of limitations so that we need not initiate litigation at this point to protect our clients rights while our discussions are ongoing."  (Id.)  At that juncture, ACIC did *not* state or imply that the limitations period had already expired.  Rather, it executed that Tolling

19

Agreement, albeit reserving its right to claim that any applicable limitations period set forth in the Bond expired prior to the effective date of the Tolling Agreement.  (Id., Ex. P.)  Thereafter, on April 26, 2011, counsel for ACIC wrote to counsel for S&G posing a list of questions that ACIC wanted answered "before going any further with addressing S&G's claim."  (Id., Ex. Q.) For the first time in the record before the Court, ACIC explicitly reserved all of its "rights, remedies and defenses as surety for Prime Energy," and indicated that "[n]othing stated or unstated in this letter is to be construed as a waiver of any such rights and remedies."  (Id.) Plaintiff submitted two further letters on June 20 and July 7, 2011, with various enclosures and responses to ACIC's questions.  (Id., Exs. R & S.)  On July 18, 2011, ACIC finally denied S&G's claim on various grounds, including the fact that the claim was submitted more than six months after Prime Energy's default.  (Id.)

Although the record does not establish that ACIC expressly waived enforcement of the limitations period or definitively acknowledged liability in this case, its conduct "was such as to reasonably convey to [Plaintiff] that the limitation period would not be strictly enforced as the parties pursued settlement opportunities."  Souden v. Elec. Ins. Co., No. Civ.A.85-3965, 1985 WL 3216, at *2 (E.D. Pa. Oct. 22, 1985).  Indeed, this record "presents a classic example where [Plaintiff] could reasonably conclude from the course of the negotiations that if there was to be a denial of liability it would have been 'exclusively for other reasons.'"  Transam. Ins. Co., 341 A.2d at 78-79 (quoting McMeekin, 36 A.2d at 432).  The Court acknowledges the lack of documented communications between the parties from November 2009 to October 2009, but recognizes that (1) a demand for payment had already been made; (2) the parties had begun a course of discussions regarding that demand; (3) ACIC was aware of Plaintiff's ongoing work on

20

the Project; (4) ACIC never indicated that Plaintiff should cease work on the Project; and (5) no

definitive payment on the Performance Bond could be made until Plaintiff completed the Project

May 2010.  Further, the reasonable inferences from this record suggest that it is not

complete—i.e., other communications may have occurred during the aforementioned time period

that are simply not documented in this collection of evidence.  Finally, the Court remarks that

ACIC promptly resumed negotiations with Plaintiff in October 2010, which is directly contrary

to any intent to enforce a time bar.  Indeed, quite beyond simply denying the claim based on the

limitations period, ACIC led Plaintiff to believe that it would engage in continued good faith

negotiations as to Plaintiff's demand by requiring that Plaintiff produce a significant number of

substantiating documents, engaging in a thorough and extensive review of the provided

information, making inquiries as to certain specifics within those documents, and even signing a

forward-going Tolling Agreement.  While such evidence may not be the "clear and precise

evidence" required to definitively prove an estoppel claim, it is certainly sufficient to preclude

Defendant from establishing—as is required in a summary judgment motion—the absence of any

genuine issue of material fact on the question of estoppel.

## III.    CONCLUSION

In light of the foregoing, the Court finds that Count IV of the Complaint against

ACIC—breach of contract under the Payment Bond—must be dismissed since Plaintiff is not a

"claimant" under the terms of that Bond.  Nonetheless, the Court will permit Plaintiff to amend

its Complaint, within twenty days of the date of this Order, to set forth a breach of contract claim

against ACIC under the Performance Bond.  Despite Defendant's allegation that such a claim is

time-barred and, thus, futile, the Court finds that Plaintiff has successfully created a genuine

issue of material fact as to whether Defendant's actions in dealing with Plaintiff during the relevant time period created an estoppel as to its enforcement.  Should Plaintiff decline to amend its Complaint within the prescribed time period, the Court will, upon proper motion by Defendant ACIC, dismiss the Complaint against ACIC.

An appropriate Order follows.